# EXHIBIT N
# TO PLAINTIFFS' MOTION FOR
# PARTIAL SUMMARY JUDGMENT

00001

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE WESTERN DISTRICT OF WASHINGTON

3    ----------------------------------X

4    DEBORAH BOLLINGER and BRYAN          :

5    BUBNICK, individually and on behalf:

6    of all others similarly          :

7    situated,                   :

8            Plaintiffs,      :

9        v.              :  Case No.:

10   RESIDENTIAL CAPITAL, LLC and     :  C10-1123 (RSM)

11   ALLY FINANCIAL, INC.,          :

12           Defendants.      :

13   ----------------------------------X

14

15      30(b)(6) Deposition of RESIDENTIAL CAPITAL, LLC

16        by and through its corporate designee

17          ANNE JANICZEK, ESQUIRE

18         Fort Washington, Pennsylvania

19          Thursday, November 10, 2011

20            8:43 a.m.

21

22   Job No.:  22-207403

23   Pages 1 - 121

24   Reported by:  Darlene S. Traficante, RPR, CSR, CMRS

25

00028

1 very few employees of that entity?

2   Q   Okay.

3       And what is their purpose for the business?

4   A   That would be a better question for someone

5 in the legal staff as far as why they have the holding

6 company structure.

7   Q   Okay.

8       So you don't know what they do?

9   A   I know it's a holding company, and I know

10 there is lots of great legal reasons why the holding

11 company structure is in place.

12   Q   Right.

13       Okay.  The one below that, GMACM Mortgage,

14 LLC, where are they headquartered?

15   A   They are headquartered in Delaware.  That's

16 the registered location for GMAC Mortgage, LLC.

17 Principal place of doing business though is here in

18 Fort Washington.

19   Q   And what's -- do they provide any products

20 or services?

21   A   Yes.

22   Q   And what is that?

23   A   That's the mortgage lending unit in which

24 they provide mortgages for consumers, mortgages for

25 correspondent and wholesale lenders and servicing.

**Janiczek, Anne 11/10/2011**                    **Page 28**

00056

1   Q   I got you.

2   A   -- functions, and then you have your

3 operational function.  Right?  But under business

4 lending.

5   Q   Okay.

6       So under business lending we have

7 origination functions and then operational functions?

8   A   Correct.

9   Q   And which -- who is in the origination

10 function?

11   A   So you have sales agents that are, again, we

12 call them sales directors and account executives that

13 work with various wholesale and correspondent clients

14 to try to, you know, get business from them and manage

15 those relationships.

16   Q   Okay.

17       And then the operational people are who?

18   A   The client relations managers, the

19 underwriters, the individuals we just talked about.

20   Q   Okay.

21       And when you're using the term, the term

22 "operational", what do you mean by that?

23   A   The ones that are reviewing the loan files,

24 making sure that they are properly packaged,

25 processed, closed, meeting our underwriting standards.

00057

1   What I would consider more of the back office function

2   as opposed to the front office function of sales. Out

3   in the field garnering the business. These

4   individuals are the ones that are, once the business

5   is garnered, are making sure it's got proper

6   documentation, it's meeting investor regulations and

7   requirements and standards. Those sorts of things.

8   Q   Okay.

9        And it's certainly related to that sales

10  function, though, right?

11  A   It's connected to the sales function.

12  Q   Okay.

13       So when -- I think my chart confusion was I

14  had business lending unit and a separate one for

15  correspondent and wholesale lending. And that's all

16  the same.

17  A   It's all the same.

18  Q   So it's called the business lending unit and

19  within it are correspondent lending, wholesale lending

20  and community finance?

21  A   Correct.

22  Q   Okay.

23       And all of the underwriters are in the

24  business lending unit?

25  A   That is correct.

**Janiczek, Anne 11/10/2011**                    **Page 57**

00065
1 Mortgage.

2   Q   Okay.

3       And how about, is there a quality control

4 function that goes on within GMAC Mortgage, LLC?

5   A   Well, there is various forms of quality

6 control. So --

7   Q   Is there a business unit or a team that's in

8 charge of that?

9   A   There is an audit team. There is a

10 compliance team.

11  Q   Okay.

12      And where do they -- in what unit do they

13 fit under?

14  A   So audit reports up through audit. I mean,

15 that's just what they're called.

16  Q   Okay.

17  A   Compliance reports up through compliance.

18  Q   Who is in charge of audit?

19  A   Ultimately for Ally it's Dan Soto. For GMAC

20 Mortgage it's Steve Fahs.

21  Q   How do you spell Steve's last name?

22  A   F-A-H-S.

23  Q   And as far as audit, the audit function goes

24 that Steve Fahs is in charge of, can you give me an

25 overview of what that is?

00066

1    A    So they will do testing of various policies

2    and procedures in the various business units, make

3    sure they're being followed, complied with.  And

4    they'll do just that, an audit of it.  And they'll

5    come back with certain findings as to whether or not

6    they have any, you know, if there is a satisfy, meets

7    standards rating given, for example, or not.

8    Q    And how about compliance, who is in charge

9    of compliance?

10    A    For mortgage it's Sonja Macumber.

11    Q    And what's her job title?

12    A    Her job title is director of compliance.

13    Q    Okay.

14         It's got to be something like that.

15         And, generally, what's the function of

16    compliance with respect to mortgage?

17    A    So they'll look at -- they work, close

18    interface with legal on different laws, regulations

19    that are coming out.  And making sure that the various

20    business unit is aware of them.

21         Again, using an example of RESPA, because

22    that's a big one, if there is any changes to RESPA

23    they're going to make sure that the various business

24    units, the origination channels for that applies, that

25    they're aware of the changes, that the changes are

00067

1 being implemented. They're going to test as well to

2 make sure that we are complying with all of the

3 changes that were implemented.

4    Q   Okay.

5        And that leads me to another thing.  You

6 said channel.  And I've seen that in some of the

7 company's documents.  How do you use that term within

8 the company?

9    A   Usually it's referred to with the

10 origination channels.  It's usually referred -- it's

11 not different than unit.  It's the same thing.

12   Q   That's what I thought.

13   A   It's just an interchangeable, a wholesale

14 channel.

15   Q   Got it.  Thanks.

16       All right.

17       I want to talk about -- I understand that

18 you're designated just to talk about the

19 classification decision of underwriters from 2006 to

20 2008; is that right?

21   A   Correct.

22   Q   Okay.

23       And when was the first decision made to

24 classify the underwriters as exempt?

25       MR. GOLDER:  Objection.

00068

1       THE WITNESS:  They are always classified as

2    exempt.

3    BY MR. SCHUG:

4     Q   Okay.

5        So from the time the company started --

6     A   I'm talking about '06 to '08.  So during

7    that time period they were always classified as

8    exempt.

9     Q   Okay.

10        And what steps did the company take within

11    that time period to ensure that they were properly

12    classified?

13     A   We utilized, as employment law counsel which

14    was my role at the time, we did a review of their job

15    functions, job responsibilities.  Engaged outside

16    counsel to do an audit to ensure that our

17    determination of exempt classification was proper.

18     Q   Okay.

19        Let's talk first about anything that you did

20    without the assistance of outside couple.  Was there

21    an exemption analysis done without the assistance of

22    counsel?

23     A   There was not an exemption analysis done

24    without outside counsel at that time.

25     Q   And is the analysis that was done with

00071

1  BY MR. SCHUG:

2  Q  And I want to be more precise than that so

3  I'm glad you're clarifying that for me.

4      Outside of the Morgan Lewis analysis,

5  between 2006 and 2008 did anyone within the company

6  specifically look at specific legal authorities and

7  rely on those authorities, or DOL opinion letters, or

8  anything, to confirm the decision that the

9  underwriters should be exempt?

10  A  Certainly I looked at the 2006 DOL opinion

11  letter, and subsequent case law.  But I would say it

12  was all in conjunction with, conversations with,

13  dialogue with outside counsel who was all along the

14  way advising us on FLSA types of issues.

15  Q  Okay.

16      And when the ultimate exemption decision was

17  made, who was it made by?

18      MR. GOLDER:  Objection.

19      THE WITNESS:  When the ultimate exemption

20  decision was made it would have been in consultation

21  with legal, myself, Mike Kaplan, the business, and

22  individuals from the compensation team who were all

23  involved in that analysis.

24  BY MR. SCHUG:

25  Q  Okay.

**Janiczek, Anne 11/10/2011**         **Page 71**

00077
1  understand?

2     A   Yes.

3     Q   And Mr. Eagles is not?

4     A   I don't know.

5     Q   Do you know where Mr. Eagles works

6  currently?

7     A   I don't.

8     Q   Okay.

9         As far as the decision to engage the Morgan

10  Lewis firm to do an audit of the underwriter job, was

11  there a specific reason why they were engaged?

12     A   When you say "specific reason", I'm not sure

13  I understand.

14     Q   Sure.

15         Was there a -- well, I'll ask it this way.

16         Why was the decision made to employ the

17  Morgan Lewis firm to review the underwriter exemption

18  classification?

19     A   Morgan Lewis had been sort of the

20  longstanding advisor of GMAC Mortgage on employment

21  law matters.  And so they were somebody that we had

22  worked with, had confidence in.  And we, therefore,

23  engaged them for the audit.

24     Q   And when did that audit first begin?

25     A   I don't remember exactly when the audit

**Janiczek, Anne 11/10/2011**          **Page 77**

00078

1 first began. It would have been some time in '06, I

2 don't remember the month.

3    Q   And just sticking with the audit, tell me

4 about the process that went on when Morgan Lewis was

5 performing their audit?

6    A   So we talked to them about the general

7 nature of what we wanted them to look at, to ensure

8 that the classification of exempt was proper. They

9 looked at -- we provided them with job descriptions.

10       They spoke with management and underwriters

11 within the underwriting unit as far as their, the

12 applicable job duties and responsibilities. They

13 looked at underlying FLSA regulations. They looked at

14 DOL opinion letters. They looked at case law.

15       Applied all of those together to come back

16 with their recommendation that the exempt

17 classification was proper.

18    Q   And how long did that process take?

19    A   I don't remember specifically, but it was,

20 you know, certainly several weeks if not a couple of

21 months.

22    Q   How many underwriters did the Morgan Lewis

23 firm talk to?

24    A   I don't recall specifically how many they

25 talked to. But I want to say a few. I don't remember

00086

1 review, felt very confident that they were

2 appropriately classified.

3    Q   Did the company do any research or did

4 Morgan Lewis do any research in to how other companies

5 in the industry were classifying underwriters at that

6 time?

7    A   I don't recall if they did research in to

8 that. I don't recall one way or the other on that.

9    Q   To your knowledge was that ever done between

10 2006 and 2008?

11   A   I really don't recall. I don't know.

12       (ALLY 30(B)(6) Deposition Exhibit 12 was

13 marked for identification and attached to the

14 transcript.)

15       MR. GOLDER:  What are we up to?

16       THE COURT REPORTER:  12.

17 BY MR. SCHUG:

18   Q   All right.

19       I'm showing you what has been marked as

20 Exhibit Number 12. This is, I understand --

21       MR. GOLDER:  Before you ask questions, maybe

22 let the witness review the document.

23       MR. SCHUG:  Sure.

24       Take a look at it.

25       THE WITNESS:  Okay.

**Janiczek, Anne 11/10/2011**                    **Page 86**

00087

1  BY MR. SCHUG:

2    Q    Now, my understanding is that even though

3  this is marked as a draft this is, in fact, the final

4  opinion letter that was given to you by the Morgan

5  Lewis law firm; is that right?

6    A    That's correct.

7    Q    And this is the one that you relied on in

8  making your exemption determination?

9    A    That's correct.

10   Q    Okay.

11       Now, as you and I discussed, it says in the

12  first paragraph here that the Underwriter I and II

13  positions in the retail organization were addressed in

14  this letter.  Do you see that?

15   A    Yes.

16   Q    Now, you used this letter to, and this

17  analysis by Morgan Lewis to make the exemption

18  determination for all of the underwriters in the

19  company; is that right?

20   A    That's correct.

21   Q    Was there -- were there any differences

22  within the job duties of the underwriters that made

23  you uncomfortable applying this exemption

24  determination to any certain group of underwriters?

25   A    No.

00088

1     Q   And did you personally review this in detail

2  when you received it?

3     A   Yes.

4     Q   And did you agree with the research and

5  analysis that the Morgan Lewis law firm had done

6  that's contained in this?

7     A   Yes.

8     Q   Okay.

9         Is there anything specifically as far as the

10  legal research and the law, is there anything that you

11  disagreed with?

12    A   No. To the best of my recollection at that

13  time there was nothing I disagreed with.

14    Q   Okay.

15        And as you sit here today is there anything

16  you can disagree with?

17    A   There is nothing that I disagree with.

18    Q   Okay.

19        And I want to talk also a little bit about

20  the factual analysis that was done by the Morgan Lewis

21  law firm. And that's contained in this letter.

22        When you read this was -- did you go through

23  it factually and verify it with anyone, that their

24  conclusions on the facts were correct?

25    A   Yes. We discussed with the business leaders

00090
1  2006 to 2008?

2      A    Well, you know, again, there was

3  conversations like we've talked about with counsel,

4  you know, which included all the underlying facts and

5  law and regulations and items that they reviewed.

6  Which included the Department of Labor '06 opinion

7  letter that we talked about.

8          So that was included in our overall

9  discussions and analysis with counsel.

10     Q    And when you received this opinion letter

11  from the Morgan Lewis law firm, did the company do any

12  separate analysis of those legal authorities on its

13  own to determine whether they thought that those

14  authorities supported the exemption decision?

15         MR. GOLDER:  Objection.

16         THE WITNESS:  We had hired Morgan Lewis to

17  do that.  That's why we engaged the firm, to do that

18  analysis of the underlying regulations, case law,

19  opinion letters.  And that was what they were engaged

20  and hired to do, and that's what they did.

21  BY MR. SCHUG:

22     Q    So the answer is, no, nobody from the

23  company did any independent analysis or research?

24         MR. GOLDER:  Objection.

25         THE WITNESS:  That's what we hired Morgan

**Janiczek, Anne 11/10/2011**                    **Page 90**

00091

1  Lewis to do. So, no, we did not do an independent

2  analysis other than what you and I discussed before as

3  far as our own reading which was in conjunction with

4  the Morgan Lewis analysis.

5  BY MR. SCHUG:

6      Q   Okay.

7          Well, I want to talk to you specifically

8  about some of the authorities that Ally is relying on

9  in this case to support, you know, their decision to

10  classify underwriters. And since it sounds like you

11  were looking at them at the time.

12         (ALLY 30(B)(6) Deposition Exhibit 13 was

13  marked for identification and attached to the

14  transcript.)

15  BY MR. SCHUG:

16     Q   I'm showing you what has been marked as

17  Exhibit 13. Do you recognize this?

18         MR. GOLDER: Let her read the document

19  first.

20         THE WITNESS: Yeah, it would be part of the

21  FLSA regulations.

22  BY MR. SCHUG:

23     Q   And did you look at this -- this is

24  regulation 29 C.F.R. 541.200, and it's the general

25  rule for administrative employees.

**Janiczek, Anne 11/10/2011**                    **Page 91**

00093
1  determination.

2  BY MR. SCHUG:

3      Q    And you're familiar with this regulation

4  though; is that correct?

5      A    I am familiar with the regulation.

6      Q    And this regulation is just the general FLSA

7  rule for the administrative exemption; is that right?

8      A    Correct.

9      Q    And this rule doesn't specifically address

10  how underwriters specifically should be classified; is

11  that right?

12          MR. GOLDER:  Objection.

13          THE WITNESS:  I don't believe it

14  specifically addresses how underwriters should be

15  classified.

16  BY MR. SCHUG:

17      Q    Okay.  You can put that one aside.

18          (ALLY 30(B)(6) Deposition Exhibit 14 was

19  marked for identification and attached to the

20  transcript.)

21  BY MR. SCHUG:

22      Q    Now I'm showing you what's been marked as

23  Exhibit 14.  Take a minute and look at it.

24          MR. GOLDER:  Take your time.

25

**Janiczek, Anne 11/10/2011**                    **Page 93**