# EXHIBIT P
# TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

```
00001
 1        IN THE UNITED STATES DISTRICT COURT
 2        FOR THE WESTERN DISTRICT OF WASHINGTON
 3
 4 DEBORAH BOLLINGER and BRIAN BUBNICK,
 5 individually and on behalf of all
 6 others similarly situated,
 7         Plaintiffs,
 8   vs.              Case No. 2:10-cv-01123-RSM
 9 RESIDENTIAL CAPITAL, LLC, GMAC
10 MORTGAGE, LLC, and ALLY FINANCIAL,
11 INC.,
12         Defendants.
13 _____
14
15
16    The Deposition of MAXINE GOODMAN,
17    Taken at 2000 Town Center, Suite 1650,
18    Southfield, Michigan,
19    Commencing at 8:52 a.m.,
20    Tuesday, December 20, 2011,
21    Before Cheri L. Gleyre, RPR, CSR-6548.
22
23
24
25
```

00012
1  A.  No.
2  Q.  All right. As you know, what we're here to talk about
3      today is the audit work that you did for GMAC with
4      regard to their mortgage underwriters. Do you
5      understand that?
6  A.  Yes.
7  Q.  And when were you engaged by GMAC to perform an audit
8      of the classification of their mortgage underwriters?
9  A.  When was I engaged to perform an audit? Oh, okay. I
10     think I got a phone call sometime in the spring,
11     summer of I think it's 2009. It must have been
12     because I started doing work for them in 2008.
13 Q.  And what was the specific question that GMAC was
14     engaging you to answer?
15 A.  I can't tell you what the specific question was, but I
16     believe the general question was, you know, we're
17     looking at our auditors -- I'm sorry, we're looking at
18     our underwriters and we want to make sure that we
19     still have them classified correctly, something along
20     those lines. I can't tell -- specifically tell you
21     what they asked me.
22 Q.  Okay. So the question was whether the underwriter
23     should be exempt or nonexempt under the FLSA, is
24     that --
25 A.  Well, basically whether they were currently classified

Goodman, Maxine 12/20/2011                                    Page 12

00013
1   appropriately.
2  Q. Who did you work with -- who did you work with at GMAC
3     when you were performing your audit?
4  A. Do you mean in the legal department or the H.R.
5     compliance people?
6  Q. Anybody you worked with in the company.
7  A. Well, I can tell you that with regard to this
8     particular issue I spoke with -- in fact, I think the
9     phone call was initiated by Ruth Drucker. I know that
10    Cathy Williams was involved, but I can't recall
11    whether I spoke to her directly, although I think that
12    we did have some conference calls, one or two
13    conference calls.
14         A lot was done by e-mail or speaking to
15    Ruth. I also spoke with -- I remember on one phone
16    conversation Lori -- Lori DePaola -- I don't think she
17    was on a phone conversation. I think I got an e-mail
18    from her maybe asking me to talk to Ruth and I
19    remember Anne Janaczek was on one phone call.
20 Q. So we've got Anne Janaczek, Ruth Drucker, Cathy
21    Williams, Lori DePaola, and is that it?
22 A. I think so.
23 Q. Is Anne Janaczek your typical contact when you do jobs
24    for GMAC?
25 A. No.

```
00015
 1   diligent lawyer would do when researching a matter in
 2   order to render an opinion.
 3 Q. When you say you researched the law, what law did you
 4   look at?
 5 A. I looked at case law.
 6 Q. What cases did you look at?
 7 A. Well, at the time I looked, well, the Whelan case,
 8   obviously. I looked at all the cases that were cited
 9   in the Whelan case. I looked at the annotated
10   regulations to see if there was any case law with
11   regard to that. I looked at the -- I looked at cases
12   that were somewhat akin where other types of
13   underwriters were involved. You know, I tend to be
14   one who probably over-researches rather than
15   under-researches. I looked at all the appropriate
16   regulations starting with the exemption itself and
17   then drilling down, so...
18 Q. And when you say -- when you're talking about
19   regulations, you're talking about the exemption
20   itself, are you talking about the general regulation
21   for the administrative exemption?
22 A. Well, that would be authoritative, but then looking
23   specifically, I don't know off the top of my head, but
24   I looked at everything -- I looked at everything that
25   I should have looked at.
```

00037
1  outside counsel for them in 2006 when they had done an
2  analysis of that group of employees.
3      So I had them send me a copy of that memo
4  and I read it and then I used that sort of as a
5  springboard to enter into discussions to find out
6  whether these positions had changed at all, and I was
7  informed that the positions as described by the
8  individual who wrote that memo were still the same.
9      And then I started -- I started doing some
10 research and I -- as a result of my research I
11 generated a lot of questions that I directed to Ruth
12 and to -- she brought Cathy into it because Cathy I
13 believe was the supervisor or manager of underwriters,
14 to answer my questions. And then I put all that
15 information together and made a conclusion based upon
16 that information.
17 Q. And other than the looking at the opinion letter that
18 Morgan lawsuit had given -- other than that did you
19 talk to any underwriters specifically? Sorry, strike
20 that. That was a bad question.
21     Did you talk to any GMAC underwriters
22 personally when you were conducting your audit?
23 A. No, I did not.
24 Q. And you said you had looked at the duties described in
25 the Morgan Lewis opinion letter; is that right?

00038

1  A.  I did look at them, yes.

2  Q.  And you were informed that the job duties hadn't

3      changed since that time; is that right?

4  A.  That's what I was told.

5  Q.  And other than that, what else did you do to gain

6      information about the underwriter job duties?

7  A.  I think I just told you, I generated multiple

8      questions based upon the discussion in the Whelan

9      case, based upon discussion in some of the cases that

10     Whelan had cited.  Probably -- I don't recall

11     whether --

12 Q.  And I'm sorry to cut you off, but I think I can

13     shortcut this because I think I have the e-mail that

14     lists your questions and --

15         MR. RUBIN:  While you let her read that can

16     we take a quick break?

17         MR. SCHUG:  Yeah.  Well, let's --

18         MR. RUBIN:  Do you want to mark that as 3

19     and then we'll go off the record?

20         MR. SCHUG:  That's fine.

21         MARKED FOR IDENTIFICATION:

22         DEPOSITION EXHIBIT 3

23         9:47 a.m.

24         (Recess taken at 9:47 a.m.)

25         (Back on the record at 10:00 a.m.)

00039
1  BY MR. SCHUG:
2  Q.  So, Ms. Goodman, now, you ultimately concluded that
3      the underwriters at GMAC should stay as exempt; is
4      that right?
5  A.  At that time point in time, yes.
6  Q.  Right. And I've seen some e-mails that were produced
7      by GMAC about that topic, but did you ever give a
8      formal opinion letter or anything like that?
9  A.  Apparently not. I think that we had a phone
10     conversation where we ultimately resolved it.
11 Q.  And who was that phone conversation with?
12 A.  With Ruth Drucker. I don't know if there was anyone
13     else on. I'm assuming it was just Ruth because she
14     was my go-to person.
15 Q.  And you just informed her in a phone call that --
16 A.  We had been going back and forth, and then for some
17     reason we decided to carry on a conversation. I mean,
18     we had had several phone conversations during the
19     course of this. It wasn't just e-mails and we were
20     having -- by that point I had concluded what I had
21     concluded, and I figured rather than go back and forth
22     with e-mails, you know, that we should talk, so -- and
23     I don't know who set up the phone call, but I know we
24     had a phone call and I did give them an opinion.
25 Q.  Okay. And do you remember the specifics of what you

```
00040
 1    told them or was it just generally telling them as a
 2    result of my research --
 3  A. Yeah.
 4  Q. -- they should be exempt?
 5  A. It was based upon all the information that they had
 6    provided me and the current state of the law, I felt
 7    that the underwriters would retain their
 8    classification as exempt.
 9  Q. Okay. Now, you ultimately were called back by GMAC to
10    give another opinion; is that right?
11  A. Well, I believe what happened is the Davis decision
12    came down which reversed the Whelan decision, and I
13    don't know who contacted who first. I don't know if I
14    contacted them when it came across my desk, or my
15    computer, that the decision had been reversed or if,
16    you know -- the H.R. folks get updates, you know,
17    through whatever organizations they belong to. But
18    one way or the other within, you know, a day or two I
19    believe of that decision coming down we spoke.
20  Q. Okay. And that was in late 2000 --
21  A. '9. November of 2009. I believe it was probably
22    right around or before Thanksgiving.
23  Q. And is it fair to say that as a result of the Davis
24    decision GMAC wanted to have the underwriter
25    classification looked at again?
```

00042
1    that.
2         Based on the information that you had at
3    that time it was your opinion that the job duties of
4    GMAC mortgages -- or GMAC's underwriters tracked what
5    was described in the Davis decision?
6 A. Well, I think that if -- you know, from a factual
7    standpoint the underwriters in -- at GMAC were
8    performing most, if not all, of the same job duties
9    that the group in the Davis case were performing, and
10   it was certainly close enough to draw that analogy.  I
11   don't recall offhand what they were called in the
12   Davis decision, but their job duties were, if not
13   identical, very, very similar.
14 Q. Okay.  And who were your main points of contact at
15   GMAC when you were undertaking the reclassification
16   analysis in late 2009?
17 A. For sure Ruth.  At that point it's possible -- I don't
18   know.  Can I look at these e-mails?
19 Q. Yeah, that's fine.
20        MR. RUBIN:  Referencing Exhibit 3, for the
21   record.
22 A. I don't know if this has -- I did not speak to Jillese
23   at all, I don't believe.  It looks like -- this is
24   June.  I think at some point Jennifer Aydelott became
25   involved.